IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Cr. No. 06-279 (RMC) |
| V. | ) | |
| | ) | |
| KELVIN KAMARA | ) | |
| | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Kelvin Kamara, through undersigned counsel, hereby respectfully submits this memorandum in aid of sentencing pursuant to Federal Rule of Criminal Procedure 32. Based on all the sentencing factors in this case, including the United States Sentencing Guidelines, Mr. Kamara respectfully asks the Court to sentence him to a period of incarceration of time served.

### BACKGROUND

Mr. Kamara was arrested in Germany in March, 2006. Following a period of incarceration in Germany and extradition to the United States, he made an initial appearance in this Court on August 28, 2006.[1] A one-count information was filed against Mr. Kamara on September 20, 2006, charging him with Transmitting Ransom Demands in Interstate and Foreign Commerce, in violation of 18 U.S.C. § 875(a). Mr. Kamara pled guilty to Count One, in accordance with a written plea agreement, on September 29, 2006.

---

[1] Mr. Kamara was presented before Magistrate Judge Alan Kay.

## DISCUSSION

**I.     THE POST-<u>BOOKER</u> SENTENCING FRAMEWORK.**

Under Justice Breyer's majority opinion in <u>Booker</u>, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. <u>See</u> 18 U.S.C. § 3553(a)(4)." <u>United States v. Booker</u>, _ U.S. __, 2005 WL 50108,*27 & n.1 (U.S. Jan. 12, 2005) (Breyer, J.). While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the remedial majority in <u>Booker</u> held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Pursuant to <u>Booker,</u> therefore, courts must treat the Guidelines as but one, among several, sentencing factors.

Pursuant to 18 U.S.C. §§ 3562 and 3553(a)–which were explicitly endorsed by the Supreme Court in <u>Booker</u>–sentencing courts should consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

Specifically, courts should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth above.

Section 3553(a) further directs sentencing courts to consider the nature and circumstances

of the offense, the history and characteristics of the defendant, the range of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged.

>Pursuant to 18 U.S.C. § 3661, also expressly endorsed by the Booker majority:

>No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence.

Section 3582 of Title 18 states that:

>[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

Taken together, the directives of Booker, as well as Sections 3553, 3661, and 3582 of Title 18, make it clear that sentencing courts may no longer consider the Guidelines alone in determining the appropriate sentence. With respect to *departures* from the Guideline range, in particular, following Booker courts need not justify sentences outside the Guidelines by citing factors that take the case outside the "heartland." Rather, as long as the sentence imposed is reasonable and supported by the factors outlined in Section 3553, courts may disagree with the range proposed by the Guidelines in individual cases and exercise their discretion.

**II.   UNDER ALL OF THE RELEVANT SENTENCING FACTORS, MR. KAMARA SHOULD RECEIVE A SENTENCE OF INCARCERATION OF TIME SERVED**

   A.   <u>Statutory Provisions</u>

Pursuant to the applicable statute, the maximum term of imprisonment for this Class C offense is 20 years. 18 U.S.C. § 875 (a).

B.  Advisory Sentencing Guidelines

(I).  *Applicable Guideline Range*

The Probation Office, consulting the 2006 edition of the Guidelines Manual, has concluded that the Total Offense Level in this case is 20 and that Mr. Kamara's criminal history category is I. The Probation Office calculates that Mr. Kamara's advisory Guideline range is 33-41 months.

(II).  *Mr. Kamara's Status as a "Deportable Alien" Warrants a Downward Departure*

The D.C. Circuit has specifically held that a downward departure may be appropriate if a defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his confinement. *United States v. Smith,* 27 F.3d 649 (D.C. Cir. 1994).

Pursuant to 18 U.S.C. § 3624(c), prisoners in federal facilities have the right to participate in pre-release programs aimed at facilitating their re-entry into the community. In *Lartey v. Dep't of Justice,* 790 F. Supp. 130 (W.D.LA. 1992), however, the court determined that the right to participate in such programs was unavailable to deportable aliens and applied only to prisoners being released into communities within the United States.

Because present law requires that a non-citizen convicted of a federal offense and sentenced to imprisonment must serve the entire sentence (minus statutory good time and time served) and precludes that individual from participating in certain programs while confined, it

follows that Mr. Kamara faces more severe treatment in this case than he otherwise would by the Bureau of Prisons. In accordance with the Circuit's holding in *Smith,* therefore, Mr. Kamara qualifies for a downward departure.

C. Other Factors

As noted above, pursuant to 18 U.S.C. §§ 3562 and 3553(a) sentencing courts should consider the need for the sentence imposed 1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; 2) to afford adequate deterrence to criminal conduct; 3) to protect the public from further crimes of the defendant; and 4) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the range of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged. Specifically, courts should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth above.

*I. Nature of the Offense*

The crime to which Mr. Kamara pled guilty is a serious offense. While Mr. Kamara in no way wishes to diminish its seriousness, he does ask the Court to take into account the fact that he did not intend to cause injury to anyone or, for that matter, to profit personally from his acts.

While Mr. Kamara did make a monetary request over e-mail, the bank account number that he provided did not belong to him or to any of his acquaintances or relatives. It was only after his arrest and incarceration that Mr. Kamara fully recognized the harm he was causing by purporting to have information about Jill Carroll to some of the very people who cared about her, and her well-being, the most.

Mr. Kamara became intrigued with Ms. Carroll's story and followed developments regularly on the website of the Christian Science Monitor. He obviously had no contact or connection with Ms. Carroll's abductors and he meant the journalist no harm. He still cannot explain what prompted him to act or how, exactly, the situation spiraled. What he has said, repeatedly, is that none of it seemed real. Having been arrested and incarcerated in Germany and then extradited and convicted in the United States, Mr. Kamara knows only too well how real and serious the situation is.

*II. Characteristics of the Defendant*

As set forth in the Presentence Investigation Report, Mr. Kamara is a young man who has already experienced significant loss and alienation is his life. Mr. Kamara grew up between Nigeria and Liberia, living alternately with his mother and both his parents. While he had the love of his parents and siblings, Mr. Kamara had to work hard from an early age–selling bread after school hours in his small Nigerian village to make money for the family.

Mr. Kamara was heavily influenced by his father, with whom he enjoyed a close relationship. After his father's death in 1990–when Mr. Kamara was merely thirteen–the family, in Mr. Kamara's words, "scattered." Mr. Kamara himself moved back to Liberia in 2002 and,

following his mother's death a year later, moved to Sierra Leone to escape the civil war. Mr. Kamara's sister was killed in the civil war, while his brother's fate remains unknown. Following his mother and sister's deaths, Mr. Kamara left for Germany, where he eventually obtained asylum status. While his situation gradually improved, Mr. Kamara had a difficult time transitioning to the country so far, and so different, from his home.

 In 2004, Mr. Kamara met, and became romantically involved with, Julia Gschwendtner. During the six months that Mr. Kamara was incarcerated in Germany, Julia visited him frequently. Now, she is awaiting his release along with their eighteen-month-old child. Mr. Kamara is very attached to both Julia and his son and longs to return to Germany to build a family with them. While in Germany, Mr. Kamara was working and providing for his son. He wants, more than anything, to be able to give his family the kind of opportunities that his father was unable to give him.

 Mr. Kamara regrets his foolish–and dangerous–decision to engage in the conduct underlying this case. The nine months he has now spent behind bars have taught him a lesson and served as a wake-up call. His experience at the DC Jail, a place difficult under any circumstances but particularly trying for someone so many miles from his loved ones and his home, has made crystal clear for him the fact that actions have consequences. Having been jailed, extradited, and incarcerated again, Mr. Kamara has come to realize the severity of his actions. A sentence any longer than that he has already served would further no purpose other than additional punishment.

*III. Needs of the Community and Public*

For the reasons stated in Section II, a sentence longer than the time he has already served would do nothing beyond further punishing Mr. Kamara for his actions. This is largely because Mr. Kamara will neither be able to participate in rehabilitative activities nor to "re-enter" this community. For those reasons, the community and public would derive no benefit from a longer sentence of incarceration.

In considering a sentence, it is not simply the quantity of time spent incarcerated, but the quality of that time, that is significant. The Court should take into account the fact that Mr. Kamara will be unable to take advantage of most of the Bureau of Prison's (hereinafter "BoP") educational, vocational, and training programs. In addition, following his "release" from the BoP, Mr. Kamara will likely face an additional four-to-six weeks of detention pending deportation hearings. As he will most likely be deported to Nigeria, Mr. Kamara faces hurdles for at least a year following his deportation before he will be able to make his way back to his girlfriend and baby in Germany.[2]

## **CONCLUSION**

For the reasons set forth above, as well as for any others that it may deem fair and reasonable, Mr. Kamara asks the Court to sentence him to a period of incarceration of time served. Such a sentence would be sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553.

---

[2]Counsel spoke with Mr. Kamara's immigration attorney in Germany. Mr. Christophe Wingerter explained that Mr. Kamara will probably be able to return to Germany in light of his son's German nationality, but only after at least a year spent in Nigeria.

A sentence of time served would mean that, taken as a whole, Mr. Kamara would have served almost ten months of incarceration. When the fact that Mr. Kamara's detention will not end with the end of this federal sentence is taken into account, a sentence of ten months is certainly sufficient to fulfill the punitive and deterrent aspects of sentencing. In terms of rehabilitation, Mr. Kamara has already had ample time to reflect on the nature, and seriousness, of his actions.

Respectfully submitted,

A.J. Kramer
Federal Public Defender


_____/s/_____
Lara G. Quint
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Washington, D.C.  20004
(202) 208-7500 ex.134