# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 06-279 (RMC)** |
| | : | |
| **v.** | : | |
| | : | |
| **KELVIN KAMARA,** | : | |
| **also known as Kelvin Onwueguchulam** | : | |
| **Okogbua,** | : | |
| **also known as Saidu Mohammed,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

### Introduction

The defendant, Kelvin Kamara, has pled guilty to transmitting ransom demands in interstate and foreign commerce. Kamara's conduct was particularly vile. He attempted to personally profit from the misfortunes of others. By making his fraudulent ransom demands for the release of the American journalist Jill Carroll, Kamara distracted and diverted the resources of the FBI during its search for the real kidnapers. He also raised false hopes among Ms. Carroll's family and friends. Kamara's offense is serious and warrants a period of incarceration greater than that which he already has served.

Consistent with its promise in the plea agreement, the government urges the Court to impose a 33 month sentence of incarceration on Kamara. The 33-month sentence is at the low end of the recommended Guideline range. It is reasonable, and it adequately accounts for all of the sentencing factors set forth in 18 U.S.C. § 3553(a). Moreover, the government's proposed sentence properly accounts for the one significant mitigating factor in Kamara's favor – his early

plea.

By contrast, the time-served sentence that Kamara suggests – which would equal 9 months of incarceration – would be manifestly unreasonable and would fall short of satisfying the sentencing goals articulated in 18 U.S.C. § 3553(a).  Among other things, such a sentence would not reflect the seriousness of Kamara's crime, would not promote respect for the law, and would have little deterrent effect on others (especially those persons overseas) who might be likewise tempted to prey on others.  In addition, a 9-month sentence here would lead to unwarranted disparities with the sentences that defendants convicted of similar conduct have received, especially in this district.

Last, the government notes that Kamara also seeks to reduce his sentence through a downward departure to account for his status as a deportable alien pursuant to the D.C. Circuit's decision in United States v. Smith, 27 F.3d 649 (D.C. Cir. 1994).  However, by the express terms of his plea agreement, Kamara waived his ability to seek any sort of downward departure.  In any event, a Smith departure, which is intended for the rare case, would not be appropriate here.

**Factual Discussion**

The facts underlying this prosecution are set forth at length in the factual proffer in support of the guilty plea and in the Presentence Report ("PSR").  There is no need to repeat them here.  There are, however, two factual assertions in Kamara's sentencing memorandum with which the government takes issue.

First, Kamara claims that, while he was in Germany, he was working.  See Kamara Sentencing Memorandum at 7.  The information that the government received from the German authorities was that Kamara was unemployed and receiving public assistance.  Moreover, the

PSR states, "At the time of the instant offense, the defendant was unemployed."  See PSR at

¶ 44.

Second, and more significant, Kamara asserts that "he did not intend to cause injury to

anyone, or, for that matter, to profit personally from his acts."  Id. at 5-6.  Such a claim is

incredible, and it is belied by Kamara's actions in this matter and his attempts to defraud other

unsuspecting victims.[1]

To begin, it would have been unnecessary for Kamara to have made the numerous death

threats against Ms. Carroll that he made if he had not been serious about trying to extort money

from The Christian Science Monitor.  Throughout his contacts with David Cook, the Monitor's

Washington Bureau chief, Kamara consistently stressed that Ms. Carroll would die if he did not

receive the $2 million he was seeking.  Thus, by way of example, he made the following explicit

and implicit threats against Ms. Carroll's life:

- "the intent is to kill jill so as to tell america we are not playing . . ." (February 13, 2006);

- "at the moment jills (sic) life is in serious danger so I had to abort my trip to germany ... jill is about to be smuggled to the mujaheeden camp in syria where she will undoubtedly be executed .. the plans (sic) is to kill her before the expiration of the deadline, but I am doing everything to ensure the decision is delayed. . . you can raise two million dollars or else jill is likely to become history, this is what the other two brigades are demanding in other (sic) to betray the mujaheeden.... we don't (sic) have much time left ... reply immediately so I know

---

[1]  Kamara further claims that the bank account number he provided to The Christian Science Monitor did not belong to him or anyone he knew.  That assertion is similarly incredible, although the government is not in a position to demonstrated its falsity.  Once the German authorities arrested Kamara, the advice that the prosecutor and case agent received from their diplomatic counterparts was not to request the Germans to do additional investigative work until after Kamara was actually extradited.  Such a request would have been through a letter rogatory and would have involved the German courts as well as German law enforcement.  Soon after Kamara was extradited, he agreed to plead guilty.

when this money will be available." (February 14, 2006);

- "so I will be expecting to read from you and get to know when you will transfer the one million as you have proposed, there is need for absolute urgency as her life in in (sic) great danger now." (February 16, 2006);

- "the mujaheeden intends to kill her before the deadline . . ." (February 19, 2006); and

- "Jill is in danger . . ." (February 24, 2006).

Kamara was also very persistent in pressing his demands for Ms. Carroll's release. When Special Agent Charles Price was in Germany for three days in February posing in an undercover capacity as an emissary from *The Christian Science Monitor*, Kamara made ten calls to the cell phone that the German authorities had given Agent Price to use and whose number Mr. Cook had given Kamara.

Last, other evidence demonstrates that Kamara is simply a fraudster. After Mr. Cook received his initial e-mails from Kamara, he contacted the FBI. See Affidavit in Support of Complaint, attached as Exhibit 1, at ¶ 10. FBI agents then obtained access to the e-mail account that Kamara was using – saidu_mhmmd@yahoo.com – pursuant to 18 U.S.C. § 2703(b). Id. A review of e-mails in that account revealed that, in addition to the extortion scheme here, Kamara had been sending out multiple communications soliciting participation in what are commonly known as Nigerian advance fee schemes. Id.

Kamara was not acting out of a perverse interest in Ms. Carroll's plight or some other unexplained motivation. He first contacted Mr. Cook, and continued to do so, for one reason only – a desire to dupe someone who might be gullible enough to send him $1 million, and

possibly even $2 million.  Instead, he got caught and is now facing the consequences.[2]

## Argument

### I.     Legal Standards

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court ruled that the

Guidelines are no longer mandatory.  However, in the remedy portion of the opinion, the Court

also made it clear that, in determining the appropriate sentence for a defendant, the district court

judge must calculate and consider the applicable guidelines range, refer to the pertinent

Sentencing Commission policy statements, and bear in mind the need to avoid unwarranted

sentencing disparities.  Although the judge must also weigh the factors enunciated in 18 U.S.C.

§ 3553(a), "it is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than

render the Guidelines a body of casual advice to be consulted or overlooked at the whim of a

sentencing judge."  United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005).  As one member

of this Court has held, "Booker requires judges to engage in a two-step analysis to determine a

reasonable sentence."  United States v. Doe, 412 F. Supp.2d 87, 90 (D. D.C. 2006) (Bates, J.)

> [A] district court shall first calculate (after making the appropriate findings of fact) the
> range prescribed by the guidelines.  Then, the court shall consider that range as well as
> other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.]
> § 3553(a) before imposing sentence.

United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005).

In United States v. Dorcely, 454 F.3d 366 (D.C. Cir. 2006), the D.C. Circuit held that "a

---

[2]  Kamara's ridiculous claim of innocent intent comes dangerously close to disqualifying
him from receiving the 3-level reduction for acceptance of responsibility under § 3E1.1.  The
government is not arguing that the Court refrain from granting Kamara the reduction, and, at the
sentencing hearing, the government will orally move for the 1-level reduction pursuant to
§ 3E1.1(b).

sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness." 454 F.3d at 376.  The Court of Appeals also held that, in resolving issues under the Guidelines, the district court uses a preponderance of the evidence standard and that consideration of acquitted or uncharged conduct is appropriate.  Id. at 372.

When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives – that is, that the sentence (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care.  See 18 U.S.C. § 3553(a)(1) and (2).  In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

## II.    Kamara Has Waived His Ability to Seek any Sort of Downward Departure; in any Event, a *Smith* Departure Is Inappropriate Here

Kamara seeks a downward departure under the D.C. Circuit's decision in Smith to account for any severe aspects of his conditions of confinement that are a result of his status as a deportable alien.  See Kamara Sentencing Memorandum at 4.  However, Part 3(C) of the parties' plea agreement expressly provides:

> The parties agree that, under the Guidelines, neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted.  Accordingly, neither party will seek such a departure or seek any adjustment not set forth herein. Nor will either party suggest that the Court consider such a departure or adjustment.

Thus, the plea agreement expressly precludes Kamara from requesting (and arguing the

-6-

appropriateness of) any type of downward departure, be it premised on Smith or on any other factors.[3]

Notwithstanding that Kamara cannot rely on a Smith departure, such a departure would not lie under the facts of this case. Smith is actually a very limited decision and does not mandate or recommend a departure based on deportability alone. As stated in Smith, any departure, including one based on deportability, should be granted only when the greater severity is undeserved and should be "highly infrequent." Id. at 655. Smith is a very carefully limited decision and, even so, it is a decision that stands virtually alone among the circuits that have considered such a departure.[4]

_____

[3] The plea agreement does permit Kamara to argue for a sentence outside of the recommended Guidelines range based on any of the considerations outlined in 18 U.S.C. § 3553(a). See Plea Agreement at Part 4. But Kamara cannot seek a lesser sentence that would result from a traditional Guidelines downward departure.

[4] Every other circuit considering the question whether collateral consequences attaching to one's status as a deportable alien, including eligibility for less restrictive terms of confinement, is a ground for departure has found no justification for a downward departure from the applicable sentencing guidelines range. See, e.g., United States v. Cardona-Rodriguez, 241 F.3d 613, 614 (8th Cir. 2001)(adverse collateral penal consequences of alienage are not cognizable basis for downward departure); United States v. Davoudi, 172 F.3d 1130, 1134 (9th Cir. 1999)(downward departure based on alienage appropriate only if case is outside the Guideline's "heartland" and should be "highly infrequent"); United States v. Lipman, 133 F.3d 726, 730 (9th Cir. 1998)("if deportability were held to be a valid ground for departure, aliens and citizens would always be treated differently because of their citizenship"); United States v. Veloza, 83 F.3d 380, 382 (11th Cir. 1996) (rejecting unavailability of preferred confinement conditions as extraordinary circumstances justifying departure); United States v. Nnanna, 7 F.3d 420, 422 (5th Cir. 1993)(collateral consequences such as ineligibility for more lenient conditions of imprisonment are not a basis for downward departure); United States v. Mendoza-Lopez, 7 F.3d 1483, 1487 (10th Cir. 1993), cert. denied, 511 U.S. 1036 (1994) (declining downward departure as interference with deportation decisions of executive branch); United States v. Restrepo, 999 F.2d 640, 644 (2d Cir.), cert. denied, 510 U.S. 954 (1993)(aside from extraordinary circumstances, downward departure not justified by collateral consequences such as unavailability of preferred confinement conditions); United States v. Holguin, 16 F. Supp. 2d 595 (D. Md. 1998)(rejecting Smith and following Restrepo).

Moreover, even under <u>Smith</u>, a defendant must demonstrate that he would necessarily and in fact be subject to substantially more severe conditions for a substantial period of his sentence than he would be if he were not subject to deportation. 27 F.3d at 655.  A departure is justified only if the Court is confident that the greater severity is *undeserved* and is *solely on account of his alienage*.  <u>Id</u>.  In this district, a <u>Smith</u> departure is not automatically applied for all aliens when it is not deserved.  <u>See</u> <u>United States v. Leandre</u>, 132 F.3d 796, 808 (D.C. Cir.) (court is not required to *sua sponte* address whether deportable status would affect severity of sentence), <u>cert. denied</u>, 523 U.S. 1131 (1998).

In this case, Kamara is a heightened flight risk due to his minimum length of residency in the United States and complete lack of community ties, wholly apart from his alienage.  For this reason, his imprisonment for the entire term of his sentence would not be solely a result of his alienage.  Moreover, the government submits that, because the step-down release into a minimum-security community facility is not an "offset" but rather serves legitimate concerns about a person's re-entry into the community after confinement, it is inapplicable here, where there will be no such re-entry because the defendant will be subject to immediate deportation, with a minimum delay, once he is released into the custody of the Immigration and Customs Enforcement upon completion of his prison sentence.  Thus, the rationale underlying <u>Smith</u> simply does not apply.

### III.     An Analysis of the Factors Enunciated in 18 U.S.C. § 3553(a) Demonstrates that a 33-Month Sentence Is Appropriate

#### A.     The Nature and Circumstances of the Offense

A ransom and extortion scheme is a very serious offense, even when, as here, the

defendant is attempting to commit his extortion by false pretenses. Fraud alone is a bad crime. When the perpetrator of the fraud targets people who are emotionally vulnerable because a loved one or friend has been taken hostage, his offense becomes particularly loathsome. The Guidelines recognize the seriousness of sending ransom demands for the purpose of extortion by assigning a high base offense level – an offense level of 23 – to the crime.

Here, Kamara's scheme was not only serious, but it also had consequences. Throughout the Carroll hostage taking, both the FBI and *The Christian Science Monitor* were actively involved in trying to locate Ms. Carroll and secure her release. As Mr. Cook notes in the letter that is attached as Exhibit 2, Kamara's communications distracted the *Monitor* and the FBI and diverted resources from the ongoing efforts to free Ms. Carroll. The government can represent that, for approximately two days after Mr. Cook received his first communications from Kamara, several FBI agents devoted all of their time to investigating the lead that Kamara's e-mails presented. In the end, they found not a real insurgent in Iraq, but a con-artist in Germany. They were no closer to gaining Ms. Carroll's freedom.

In addition to the waste of private and government resources, Kamara's actions also added to the emotional stress that Ms. Carroll's family suffered. His scam was cruel.

**B.      The History and Characteristics of the Offender**

The government acknowledges that Kamara was born poor in a war-torn region of Africa and has suffered some misfortunes. But there are many similar refugees who leave those lands and who never commit crimes. What is notable about Kamara is that, notwithstanding his limited education, he is quite talented. He is very computer literate, and his communications with Mr. Cook evince a high degree of sophistication. It is unfortunate that someone with

Kamara's talents finds himself where he is now. However, he made the choice to use his intellectual gifts for crime. There is nothing that indicates that, once in Germany, Kamara was powerless to refrain from a life of fraud. One may have sympathy for Kamara's current situation. But it is not a reason for mitigating his sentence beyond the low-end of his recommended Guideline range.

### C.     The Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public

The time-served sentence that Kamara suggests would do virtually nothing to promote respect for the law, provide just punishment, and afford adequate deterrence. For Kamara to be released after only nine months of incarceration would not send a message to others either overseas or here that attempting to commit extortion through ransom demands is intolerable. To the contrary, such a lenient sentence would more likely appear to be a reasonable risk to take in light of the large payoff that a successful ransom extortion scheme could bring. On the other hand, a 33-month sentence would have real deterrent effect, as well as provide just punishment to Kamara for his conduct.

### D.     The Need to Provide the Defendant with Educational or Vocational Training

Kamara could receive additional education and training while incarcerated. Given his natural aptitudes, he is likely to benefit from the offerings in the U.S. penal system.

### E.     The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

A 9-month sentence would be significantly less than recent sentences in this district for

similar crimes.[5]  The most analogous offenses are the hoax threats cases – that is, the cases involving threats to kill or harm high-ranking officials or threats to destroy buildings or property. These prosecutions also involve disruptions of people's activities and the needless waste of law enforcement resources.  The 33-month sentence that the government is proposing here is in line with the sentences that other judges have imposed in the threats matters.  The five most recent cases are listed below:[6]

      (1)      United States v. Juann Tubbs, Cr. No. 03-294 (JR)

On June 9, 2003, Juann Tubbs, while outside Union Station, pulled a pin out of what turned out to be a dummy hand grenade and threatened to detonate it.  He pled guilty in August 2003 to violating 18 U.S.C. § 844(e), and, on December 9, 2003, Judge Robertson sentenced him to 24 months of incarceration.  Tubbs had a criminal history category of I.

      (2)      United States v. Jason Lewis Foster, Cr. No. 04-269 (PLF)

On December 12, 2003, Foster called 911 several times and claimed to have placed three bombs in the 400 block of Oklahoma Avenue, NE.  He made similar calls to 911 on February 20, 2004.  On each occasion, the police evacuated homes and bus and Metro routes were temporarily closed.  Foster pled guilty to violating 18 U.S.C. § 844(e).  On November 4, 2004, Judge Friedman sentenced Foster, who had a criminal history category of III, to 50 months of

---

[5]  Government counsel has spoken with a representative from the General Counsel's Office at the Bureau of Prisons ("BOP").  According to the representative, after verifying that Kamara had indeed been held in Germany in connection with this offense, BOP would, in all likelihood, give Kamara credit for the time he spent incarcerated in Germany before being extradited to the United States.

[6]  Three of these defendants had minor criminal histories.  However, the base offense level under the threats Guideline (§ 2A6.1) is only 12, with various enhancements and reductions within the guideline.

incarceration.

       (3)      United States v. America Yegile Haileselassie, Cr. No. 04-244 (JDB)

On April 25, 2004, Haileselassie made several calls to 911 threatening to blow up Metro stations and trains. These calls caused the authorities to shut down the Metro system for a period of time. On September 8, 2004, Judge Bates sentenced the defendant, who had a criminal history category of II, to 33 months of incarceration.

       (4)      United States v. Lowell Timmers, Cr. No. 05-73 (EGS)

On June 18, 2005, Timmers drove a van up to the White House and threatened to detonate it. He also threatened to kill the President. Timmers pled guilty in March 2005. On July 20, 2005, Judge Sullivan sentenced Timmers, who had no prior record, to 34 months of incarceration.

       (5)      United States v. Dwight Watson, Cr. No. 03-146 (TPJ)

On March 17, 2003, Watson drove a tractor that was pulling a trailer with a large box into the pond at Constitution Gardens on the Mall. He claimed that the box was loaded with explosives and threatened to detonate them if the authorities tried to remove him from the pond. He remained in the pond until surrendering on March 19, 2003. A jury convicted Watson of violating 18 U.S.C. § 844(e). In June 2004, Judge Jackson sentenced Watson, who had no prior convictions, to 72 months of incarceration. Two days later, the Supreme Court decided Blakely v. Washington, 542 U.S. 296 (2004). Judge Jackson then vacated Watson's sentence, believing that Blakely precluded him from applying any of the enhancements under § 2A6.1. Watson was sentenced to time-served, which represented 16 months of incarceration. The government has appealed Watson's sentence. The defense has conceded that Judge Jackson erred. The appeal

-12-

was argued on November 17, 2006, and is under advisement before the D.C. Circuit.

## Conclusion

For the foregoing reasons, the Court should impose the recommended and reasonable

sentence of 33 months of incarceration.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
D.C. Bar No. 498610


By: _____/s/_____
Jay I. Bratt
Assistant United States Attorney
Illinois Bar No. 6187361
National Security Section
Room 11-437
555 Fourth Street, NW
Washington, D.C. 20530
(202) 353-3602
Jay.Bratt@usdoj.gov